## Tomassi *v.* Tioga Trust Company, Appellant.

*Banks—Transmitting money—Employment of sub-agents—Liability for negligence of—Agency.*

In an action of trespass to recover from defendant bank for the negligence of its sub-agent in honoring a draft, it appeared that plaintiff purchased fruit subject to government inspection and arranged with defendant to forward the purchase price. The evidence disclosed that defendant was instructed to obtain an inspection certificate with the bill of lading. The place of payment being a distant city it was necessary for the defendant, in making remittances, to forward through sub-agents. Defendant properly transmitted the credit and instructions received from plaintiff to a sub-agent. The sub-agent at the place of payment paid the draft without obtaining the inspection certificate.

In such circumstances there being no evidence of negligence in selecting the sub-agent the defendant is not liable for loss resulting from the negligence of its sub-agent.

In such case defendant was impliedly authorized by the nature of the transaction to appoint necessary sub-agents, and the risk of negligence of such sub-agent was assumed by plaintiff in the absence of an express agreement to the contrary.

The distinction between the liability of one who contracts to do a thing and one who merely receives the delegation of authority to act for another is fundamental. If the contract be only for the immediate service of the agent, and for his faithful conduct as representing his principal, the responsibility ceases with the limits of the personal service undertaken. But where the contract looks mainly to the things to be done, and the undertaking is for the due use of all proper means to performance, the responsibility extends to all necessary and proper means to accomplish the object, by whomsoever used

Argued October 14, 1926.   Appeal No. 170, October T., 1926, by defendant from judgment of M. C. Philadelphia County, June T., 1925, No. 862, in the case of Annunzio Tomassi v. Tioga Trust Company.   Before Porter, P. J., Henderson, Trexler, Keller, Linn and Cunningham, JJ.   Reversed.

Trespass to recover from defendant bank for the negligence of its correspondent in honoring a draft. Before Brown, J., without a jury.

The facts are stated in the opinion of the Superior Court.

The Court found for the plaintiff in the sum of $2,285.71, and entered judgment thereon.   Defendant appealed.

*Errors assigned* were the findings of the court and refusal of defendant's motion for judgment non obstante veredicto.

*Earl W. Thompson,* for appellant.—The defendant was merely an agent for transmission of the money to the sub-agent: Mechanics Bank of the City and County of Philadelphia v. Earp, 4 Rawle 384; Merchants' National Bank of Philadelphia v. Goodman, 109 Pa. 422; Bellemire v. The Bank of the United States, 4 Wharton 105; Farmers' National Bank of Beaver Falls v. Nelson, 255 Pa. 455; Bank of Wesleyville v. Rose, 85 Pa. Superior Ct. 52.

*H. M. McCaughey,* for appellee, cited: Cohen v. Tradesman's National Bank, 262 Pa. 78; Kraber v. Insurance Co., 129 Pa. 12; Bradstreet v. Everson, 72 Pa. 124; Siner v. Stearne, 155 Pa. 62.

Opinion by Linn, J., March 3, 1927:

This trial, without a jury, resulted in judgment for plaintiff.   Defendant appealed.

1. A Chicago dealer in grapes in transit from California sold to the plaintiff two cars, by the following telegram: "We confirm car Alicante at hundred ten Pacific 1448 shipped twenty-sixth contents 1125 lided lugs net 31550 pounds also car Mataros shipped twenty-third Pacific 11619 Contents 1170 lug net 29135 pounds at ninety government inspection show alicants less than two per cent defects almost perfect and mataros less than four per cent defects absolutely no rot or decay either car total invoice both cars 3046.32 we do not divert car without payment but sell on inspections which guaranteed as above stated wire money to Foreman National Bank payable surrender invoices railroad diversion and delivery orders attached state routing desired Pennsylvania Railway embargoed."

2. Having bought the grapes, plaintiff made another contract. He arranged with defendant for payment by wire. He testified that he requested the bank "to wire the money to Chicago." His witness stated: "I showed him [bank clerk] the telegram and I told him I wanted to forward this money to [sellers] through the Foreman National Bank and I impressed upon him he should get the inspection certificate, the way bill and so forth, but the most is the inspection certificate, which would describe the quality of the grapes......" Plaintiff was a depositor and customer of the bank and at that time increased his deposit sufficiently to pay for the grapes. Defendant had no correspondent in Chicago, but immediately telephoned to the Philadelphia National Bank, in Philadelphia, the instructions it had received from plaintiff and requested that bank to wire its Chicago correspondent accordingly. Plaintiff put in evidence the following telegram sent by the Philadelphia National Bank to its Chicago correspondent, the Continental and Commercial Bank: "Charge our account and pay to the Foreman National Bank, Chicago, for account of De Wilde & Co.

[sellers] $3046.32 to be paid upon surrender of delivery order, weight and inspection certificate......
By order of the Tioga Trust Company, Philadelphia, must be in refrigerator cars.'' The Chicago bank made payment to the seller through or at the Foreman National Bank and received certain documents; while the evidence does not state just what was received, it is clear that no inspection certificates were obtained and that none had ever been issued on these cars. The documents were immediately sent to the Philadelphia National Bank and were promptly delivered to plaintiff by defendant. He made no objection then that there were no inspection certificates. Later, the cars arrived, several days apart. At this point his evidence is: ''......... as I opened the car, I noticed they were not the quality I bought and I immediately telegraphed to [sellers] and told them that they were not the grapes that I had ordered, and they answered they would do their best, they would try to refund some of the money back, and at the same time I had a look over the documents .......'' and discovered there were no inspection certificates. He then obtained inspectors from the Federal Department of Agriculture who inspected the grapes at the delivery yard; their certificates describe a condition of rot and defects much in excess of what was specified in sellers' telegram. Plaintiff then unloaded the cars and ordered their contents sold at public auction and brought suit to recover from the defendant bank, the difference between what he paid and the net sum realized at auction, a subject we need not consider.

The evidence of defendant substantially agrees with the evidence of plaintiff as to the nature of the contract to wire the purchase price to Chicago. Defendant's witness said, ''they wanted me to wire the money to De Wilde and Company [sellers] because the only way that De Wilde would handle the transaction they would

have to have the money in their hands before they would divert the cars from Chicago to Philadelphia ...... We wired it through our correspondent, the Philadelphia National Bank.'' This witness did, however, say that when he handed the shipping documents to plaintiff before the grapes arrived, he ''called their attention'' to the fact that no inspection certificates had been received and that plaintiff replied, ''Well, they said the draft had been paid for, the best thing they could do was to take the grapes in.'' We may add that the car 1448, instead of containing grapes sold as Alicante, contained grapes described by plaintiff's witness as Mission, the ''cost'' of which was ''about $40 a ton'' whereas the Alicante cost,—the witness said—about $120 a ton (the contract stated 110). The car 11619, instead of containing Mataros, contained Grignolina, described by the witness as a ''grade inferior to Mataros.''

3. The statement of claim bases the right to recover on negligence; ''that the defendant herein wrongfully and negligently honored the draft of the said [sellers] and ...... paid or caused to be paid to the Foreman National Bank the depository of said [sellers] the sum of $3046.32 without compelling or having in their possession the inspection certificate of the Department of Agriculture which would indicate the quantity and quality of the grapes.'' The plaintiff received the particular cars initialed and numbered as stated in sellers' telegram, and so far as appears, the quantity of grapes purchased.

On the evidence stated in 1 and 2 above, the court below found that there was a contract by which defendant agreed to pay the purchase price at the sellers' bank in Chicago, and to receive therefor shipping documents providing for delivery to plaintiff as stated in the telegram and, in addition, an inspection certificate.

To support that, plaintiff argues that the undertaking of defendant was to provide for paying the purchase price in Chicago but not to pay unless the sellers delivered a certificate that one car contained grapes of the brand Alicante and the other Mataros, and that the defects were within the percentages specified, and that for breach of that obligation—called negligence in his statement—liability results. To sustain his argument, cases are cited to show that an agent is responsible to his principal for failure to perform the contract of agency. But the important question remains; what was the contract? Was it to make payment in Chicago or was it a delegation of authority to direct payment to be made there by a competent sub-agent? The evidence does not support the inference that the defendant was to pay or guarantee the payment of the purchase price only on condition that shipping documents and inspection certificates were delivered showing the brand of grapes and the percentages of defects to be as stated in sellers' telegram. It is hardly conceivable, and it would be out of the ordinary course of business to expect that a bank, though engaged in the transmission of money, should agree to do what substantially amounts to guaranteeing that the sellers had complied with their contract of sale, without specific stipulation to that effect and on payment of special consideration. The terms stated in the quoted testimony of the witness would have been met literally with any inspection certificate without regard to what it stated concerning defects. If the inspection certificates such as plaintiff obtained at point of delivery in Philadelphia, had been received by the defendant's correspondent in Chicago, the plaintiff would have been as much deceived by his seller as he was in fact, while the defendant would have kept its contract to the letter by obtaining the "certificate which would describe the quality of the grapes." The obligation of the sellers

was not imposed on the bank by anything described in the evidence from which plaintiff's contract with the bank can be found. It was not intended to make the bank a surety for the seller. There is no evidence that the bank received any commission for its services; only the expenses incident to wiring were paid. The fact that the plaintiff was a depositor and customer of the bank constitutes adequate consideration, of course, for the transmission of the money or credit, but in considering the character of the obligation intended by the parties as disclosed by what was said and done, the consideration affords some indication of the scope of the obligation which the parties intended should be imposed.

It is therefore clear that defendant assumed the obligation only of transmitting by wire the credit plaintiff desired with the instructions received from him; to accomplish that, as the plaintiff knew, necessarily required the aid of one or more responsible sub-agents; plaintiff proved that his instructions to defendant were specifically given by defendant's sub-agent, the Philadelphia National Bank. It was the conduct of the Chicago sub-agent, the Continental and Commercial National Bank, that created the condition of which plaintiff complains.

As defendant was in no default in transmitting the credit with instructions given, its conduct is governed by the same rule which exempts from liability for the defaults of such sub-agent, a bank receiving drafts for transmission to a collecting bank (Mechanics Bank v. Earp, 4 Rawle 383), or one receiving checks and notes for collection, (see authorities cited in Bank of Wesleyville v. Rose, 85 Pa. Superior Ct. 52, 57; New York Hotel Statler Co. v. Girard National Bank, 87 Pa. Superior Ct. 94, 97). The basis of the refusal to hold the initial bank liable for such omission of sub-agents is thus stated in Exchange Nat. Bank v. Third Nat.

Bank, 112 U. S. 276, 281; "The authorities which support this rule rest on the proposition, that since what is to be done by a bank employed to collect a draft payable at another place cannot be done by any of its ordinary officers or servants, but must be entrusted to a sub-agent, the risk of the neglect of the sub-agent is upon the party employing the bank, on the view that he has impliedly authorized the employment of the sub-agent; and that the incidental benefit which the bank may receive, from collecting the draft, in the absence of an express or implied agreement for compensation, is not a sufficient consideration from which to legally infer a contract to warrant against loss from the negligence of the sub-agent." See also 2 C. J. p. 688, sec. 347.

Our question is not what the plaintiff and defendant might have agreed to do but what the evidence shows their agreement was. "The distinction between the liability of one who contracts to do a thing and that of one who merely receives a delegation of authority to act for another is a fundamental one, applicable to the present case. If the agency is an undertaking to do the business, the original principal may look to the immediate contractor with himself and is not obliged to look to inferior or distant undercontractors or sub-agents, when defaults occur injurious to his interest": Exchange Nat. Bank v. Third Nat. Bank, *supra.*

Both parties understood that the purchase price must be transferred immediately. Plaintiff instructed defendant to make the transfer by wire. There is a suggestion in the evidence, though the point is not clear and is not here relied on, that defendant's clerk in plaintiff's presence, telephoned plaintiff's order to the Philadelphia National Bank. The nature of the business necessarily involved the employment of one or more sub-agents. "The distinction recurs, between the rule of merely personal representative agency and

the responsibility imposed by the law of commercial contracts. This solves the difficulty and reconciles the apparent conflict of decision in many cases. The nature of the contract is the test. If the contract be only for the immediate services of the agent and for his faithful conduct as representing his principal, the responsibility ceases with the limits of the personal services undertaken. But where the contract looks mainly to the thing to be done, and the undertaking is for the due use of all proper means to performance, the responsibility extends to all necessary and proper means to accomplish the object, by whomsoever used'': Exchange Nat. Bank v. Third Nat. Bank, supra.

Judgment reversed and here entered for defendant.